Mize *v.* Mize.

5-2871 364 S. W. 2d 671

Opinion delivered February 11, 1963.

*Moses, McClellan, Arnold, Owen & McDermott,* for appellant.

*Gaughan & Laney* and *Fred E. Briner,* for appellee.

CARLETON HARRIS, Chief Justice. Benton C. Mize, who died in 1898, was survived by his widow and five children, namely, Maggie Lawhon, Jeff Mize, Mattie Hamilton, Dora Sheridan, and Henry B. Mize. At the time of his death, he was the owner of a certain 120 acres of land located in Saline County. The widow died in 1904, and thereafter various members of the family occupied portions of the land until 1913, when D. J. Sheridan, husband of Dora, purchased the interest of three of the heirs, viz., Maggie Lawhon, Jeff Mize and Mattie Hamilton. D. J. and Dora Sheridan lived on the land and reared a family there. Dora died in 1927, and D. J. died in 1931. There-

after, in 1933, their heirs agreed on the division of the 120 acres. There were five children, L. B. Sheridan, Havis Sheridan, Will Sheridan, Thomas Sheridan, and Della Reed. Thomas, the eldest brother, did not desire any of the land, and deeds were prepared by a Benton attorney, and executed by the parties, conveying 30 acres to each of the other heirs. The four children each assumed responsibility for their respective 30 acres, and paid taxes in their own names.[1] Henry Mize died in 1958, leaving a widow and several children. In October, 1959, appellants (some of the heirs of Maggie Lawhon, Mattie Hamilton, Jeff Mize and Henry B. Mize) instituted suit in the Saline Chancery Court, seeking partition of the 120 acres. The court held that the heirs of Maggie Lawhon, Mattie Hamilton, and Jeff Mize, were bound by the deeds executed by their ancestors to D. J. Sheridan; further, "that a deed was never delivered by H. B. (Henry) Mize, but that the heirs of Henry Mize are now barred by laches and they are estopped from claiming any interest in said land; that the defendants, Will Sheridan, L. B. Sheridan and Havis Sheridan, derived their respective interest in said land by inheritance from their mother, Dora Mize Sheridan, and their father, D. J. Sheridan, and by exchange of deeds among themselves and purchases from others; * * * ". Title was quieted in appellees, L. B. Sheridan, Havis Sheridan and Will Sheridan. From the decree so entered, comes this appeal. For reversal, appellants simply assert that the doctrine of laches does not apply against those seeking to enforce a legal title.

Able counsel for appellants cite several cases in support of their contention; on the other hand, counsel for appellees cite approximately a like number of cases to sustain their position. Actually, both sides cite several of the same cases. It is apparent that the decision in each case is controlled by the facts of the particular litigation.

In the instant case, the evidence reflects that Henry B. Mize, as a boy, lived in the home of D. J. Sheridan for

---

[1] Della Reed failed to pay the taxes on her 30 acres and it subsequently forfeited to the state, was sold by the state to one Albert Childress, and was later purchased by L. B. Sheridan and Havis Sheridan.

quite some period of time, paying no room or board. While proof on the part of appellees was that Mize promised to execute a deed for his interest in the property, we attach no significance to this testimony, since Henry Mize was, at the time, a minor. After leaving the farm here involved, Mize farmed at Hensley, subsequently lived for about nine years south of Little Rock on the Arch Street Pike, and after other moves, bought a place on Base Line Road, and lived there for twenty years until his death.

According to the testimony, when D. J. Sheridan sold timber off the land in 1927, Henry contended that he owned a 1/5 interest. Sheridan contended that he owned the property and it was finally agreed that the lumber company would hold the money and Henry could make his claim; however, the latter never did make claim to the money, and it was eventually paid to Sheridan. The evidence further showed that Henry Mize visited the property at times throughout the years. In 1947, the Sheridan heirs had the land surveyed and the corners marked and lines blazed. Adjoining land owners were notified of the survey and a notice was published in the newspaper. It certainly would appear that Mize, a resident of Pulaski County for most of his life after leaving Sheridan's home, and having made at least some trips back to the area, would have been cognizant of the fact that the Sheridan heirs were claiming the property as their own. Improvements were made by the Sheridans, parts of the land cultivated, taxes paid on the separate tracts, and these acts were certainly indicative of a claim of absolute ownership.

At any rate, according to Mrs. Mize, widow of Henry, her husband decided to ''do something'' four or five years before his death. Evidence presented by Mrs. Mize and Bill Mize, a son, reflected that Henry had an abstract prepared in 1952 or 1953, and talked with a lawyer. The attorney held the abstract for a time, and turned it over to another attorney, who died with the abstract in his possession. Mrs. Mize testified that her husband then had another abstract made, but no subse-

quent action was taken. The widow also stated that her husband had known that L. B. Sheridan and Havis Sheridan had built homes on the land.

From the facts herein enumerated, it is established that for a period of more than forty years, though he lived within a comparatively short distance of the land, did some visiting with members of the Sheridan family, and was aware of the improvements that had been made to the premises, no action was ever taken by Henry Mize to enforce his claim to the property. As stated at the outset, authority is cited by both sides, though some of the cases cited by appellants likewise recognize the defense of laches where the facts justify that defense.

For instance, in *Tatum* v. *Arkansas Lbr. Co.*, 103 Ark. 251, 146 S. W. 135, this court said,

"Laches in legal significance is not mere delay, but delay that works disadvantage to another. So long as parties are in the same condition, it matters little whether he presses a right promptly or slowly within limits allowed by law; but when knowing his rights he takes no step to enforce them until the condition of the other party has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right. The disadvantage may come from the loss of evidence, change of title, intervention of equities, and other causes; but, when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief."

We have held that as between co-tenants, possession of one is the possession of all, *unless there has been an actual ouster or the possession be hostile to the right of the others*. *Ashley* v. *Garrett*, 218 Ark. 126, 234 S. W. 2d 513. We are of the view that the proof in the instant case sustains the argument of appellees. A case that bears some similarity to the one at bar is *Mitchell* v. *Malvern Lbr. Co.*, 222 Ark. 266, 258 S. W. 2d 549. There, we said,

"With a variety of defenses suggested by the appellee, we select laches as the one on which to rest the affirmance. The uncontradicted evidence established:

(a)  that even though the lands were wild and unimproved, nevertheless Malvern has all the time since 1934 paid all taxes on the lands under a deed duly of record and definitely describing the lands, and Malvern has all the time had the lines around the lands painted and blazed, and two of its employees have regularly checked the lands at least twice each month to see that there was no trespassing;

(b)  that some of the plaintiffs have resided within one mile of the lands and have frequently passed by the said lands;

(c)  that McKinley Mitchell—the moving spirit in the present litigation—learned in 1942 of the sale of the lands to Malvern and of Malvern's possession of the lands, and offered in that year to 'redeem' the lands;

(d)  that after learning of Malvern's deed and possession in 1942, there was a delay until 1952 before instituting the present suit;" * * *

It is also, of course, noticeable that though, according to the proof, Mize apparently made some preliminary preparations in 1952 or 1953, to seek enforcement of his claim, *he never did institute suit, and this litigation did not commence until after his death.*

We think the facts support the conclusion reached by the Chancellor.

Affirmed.